**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Richard PAOLINO, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 11, 2003.
Filed Dec. 2, 2003.

---

Geoffrey A. Graham, Doylestown, for appellant.

Thomas G. Gambardella, Asst. Dist. Atty., Doylestown, for Com., appellee.

Before: TODD, OLSZEWSKI and CAVANAUGH, JJ.

CAVANAUGH, J.

¶ 1 Richard Paolino appeals from his judgment of sentence of 30 to 120 years of imprisonment and a fine of $375,000.00 imposed on him following conviction of insurance fraud, conspiracy to practice osteopathic medicine without a license, practicing osteopathic medicine without a license, delivery of Vicodin, delivery of Xanax, delivery of a Schedule II controlled substance, prescribing controlled substances contrary to the requirements of law and conspiracy to prescribe controlled substances contrary to the requirements of law.

¶ 2 The conviction followed a two-week jury trial; followed by sentencing and a direct appeal to this court. In his Pa. R.A.P.1925(a) Opinion, the Honorable David W. Heckler found the background as follows. The history is based on the trial record.

### BACKGROUND

At trial, the Commonwealth presented evidence that established the following: during the year 2000, appellant practiced osteopathic medicine from an office located at 3554 Hulmeville Road, Suite 102, Bensalem, Bucks County, Pennsylvania. Ronald Hyman was a pharmacist for Masterson's Pharmacy in Philadelphia, approximately thirty miles away from appellant's office. During the summer of 2000, Mr. Hyman placed telephone calls to the Drug Enforcement Agency, the Board of Pharmacy, and the Board of Medicine regarding what Mr. Hyman considered to be alarming prescriptions for OxyContin and Xanax written by appellant.[1] Due to the addictive nature of both Xanax and OxyContin, Mr. Hyman had telephoned appellant to verify the accuracy of the prescriptions and the dosages. Mr. Hyman was told by appellant that the doses were correct, and that if Mr. Hyman did not wish to fill the prescriptions as written, he could simply refuse to fill the prescriptions and appellant would direct his patients to another pharmacy. Based on the information he had received from the manufacturer of OxyContin through literature and seminars, Mr. Hyman began refusing to fill the prescriptions because he felt the doses prescribed by appellant were too high and the prescriptions provided for refills too frequently. In response to complaints from Mr. Hyman and other pharmacies in the Philadelphia and Bucks Counties, the Diversion Investigation Unit of the Bureau of Narcotics for the Pennsylvania Office of Attorney General began an investigation of appellant's medical practice in August of 2000.

On August 7, 2000, an Order to Show Cause was filed by the Pennsylvania State Bureau of Professional and Occupational Affairs. Appellant was accused therein of practicing without professional liability insurance for the period from March 1, 1998, through March 31, 2000. Pennsylvania state law requires that all practicing physicians maintain professional liability insurance coverage. The Order to Show Cause provided that upon appellant's response, a hearing would be scheduled before the Bureau of Occupational Affairs at which appellant could present evidence in response to the allegation. Appellant was served by first class mail at his office address.

---

1. Trial testimony of Ronald Hyman. N.T., 4/3/02, pp. 110–122.

The notice served upon appellant advised that he had thirty days to respond or a default judgment would be entered against him. There is no record of any response on behalf of appellant. On September 26, 2000, a motion was made to enter a default judgment against appellant. After finding that appellant had not paid his professional liability insurance for the aforementioned two-year period, on November 2, 2000, the Bureau of Professional and Occupational Affairs issued an indefinite suspension of appellant's medical license. Appellant's indefinite suspension went into effect on November 23, 2000. The Bureau of Professional and Occupation Affairs issued two letters informing appellant of his suspension. One letter was sent by certified mail and one letter by first class mail. Both letters were mailed to 3554 Hulmeville Road, Bensalem, PA. The certified letter was returned unclaimed. On October 31, 2000, appellant's license to practice osteopathic medicine in the Commonwealth of Pennsylvania had expired in due course because no application for renewal had been filed. Therefore, as of November 23, 2000, appellant was purporting to practice medicine although his license to do so was both expired and suspended.

When a license is suspended, a doctor must cease all medical practice and return his licensure documents to the State Board of Osteopathic Medicine. At some point in November of 2000, appellant sent a check in the correct amount of one hundred forty dollars to the State Board of Osteopathic Medicine seeking license renewal. Toward the end of December of 2000, appellant placed a telephone call to the State Board of Osteopathic Medicine seeking license renewal. Appellant was informed by Gina Bittner, the Administra-

tor of the State Board of Osteopathic Medicine, that he should not be practicing medicine due to his expired and suspended license.[2] Appellant denied ever receiving notice of the hearing in November, and appellant further claimed to be unaware of the resulting suspension and only aware that his license had expired. Ms. Bittner told appellant he could request reinstatement after six months of suspension according to the procedure for reinstatement of a suspended license. Ms. Bittner sent copies of the November 2, 2000, adjudication and order as well as a renewal notice to appellant. Appellant requested reinstatement, and his request was denied on March 15, 2001. The March 15th order provided that appellant would not be allowed to apply for reinstatement for six months.

On January 16, 2001, Agent John Walczak, a law enforcement officer affiliated with the Diversion Unit of the Bureau of Narcotics of the Pennsylvania Office of Attorney General, and United States DEA (Drug Enforcement Agency) Diversion Investigator Brian Rucker visited appellant at his office. The investigators informed appellant that he was unauthorized to prescribe, administer, dispense, or handle any controlled substance due to the suspension of his medical license. At this time, the investigators confiscated seventeen Diazepam injectables. The investigators inquired whether appellant knew anything about the sale of the drug OxyContin on the street. Appellant denied any knowledge, but informed the investigators that one of his prescription pads had been stolen. Appellant told investigators he would close his practice for three days to attempt to resolve his licensing problems.

2. Gina Bittner testified as to her contacts with   appellant at trial. N.T., 4/8/02, pp. 13–59.

On January 26, 2001, appellant met with Dr. David Harmon. Appellant told Dr. Harmon that he had lost his ability to write prescriptions because he had failed to pay his malpractice insurance. Dr. Harmon came to appellant's office and noticed that appellant had a large practice. Dr. Harmon felt that "due to the large practice he had, and the relationship he had with his patients, [Dr. Harmon] saw no reason why [appellant] couldn't continue to see them [the patients]." N.T. 4/3/02, p. 189. Dr. Harmon testified that he provided appellant with usable blank prescriptions by crossing out appellant's name and signing his name and placing his DEA number on appellant's blank prescription pads. (Appellant had been informed by Agents Walczak and Rucker that without a valid license to practice medicine, he was not entitled to a DEA license and number.) Any prescription for controlled substances written without a valid DEA number could not lawfully be filled by any pharmacy. Thus, appellant needed to use Dr. Harmon's DEA number if he was to continue to write prescriptions for regulated drugs. Dr. Harmon was compensated by a payment of $2500 for one week, plus one quarter of Dr. Harmon's malpractice insurance premium.

From January 29, 2001, through February 10, 2001, Dr. Harmon worked for appellant, Monday through Friday from 9:00 a.m. until 1:00 p.m. On February 11, 2001, Dr. Harmon left for Florida.[3] Dr. Harmon testified at trial that he never saw patients or prescribed any medication for patients. N.T. 4/3/02, p. 192–

93. Dr. Harmon did review patient files because his name was on the prescriptions. Dr. Harmon spoke with appellant about his concerns with the many prescriptions given for OxyContin, a drug that Dr. Harmon knew little about except that it was used in the treatment of pain and had a potential for abuse similar to Percocet. N.T. 4/3/02, p. 194.

With Dr. Harmon's departure, appellant was left without a DEA number to use in writing prescriptions for narcotics. Prior to his departure for Florida, Dr. Harmon had contacted Dr. Wesley Collier. Drs. Harmon and Collier had been friends since high school. Dr. Harmon informed Dr. Collier of appellant's situation. N.T. 4/3/02, p. 196. (Dr. Harmon's testimony that he had informed Dr. Collier of appellant's license suspension established that Dr. Collier was aware that appellant's license to practice osteopathic medicine had been suspended.[4]) After Dr. Harmon left, Dr. Collier took over where he left off, signing and inserting his DEA number on each page of a large number of appellant's blank prescription pads. Dr. Collier "worked" for appellant for six days in February of 2001, appearing for between two and four hours each day. Dr. Collier's only duty was to review files without seeing the patients to whom the files referred. Dr. Collier received $500.00 a day from appellant for his services.

During the time Drs. Collier and Harmon were involved in appellant's practice, Attorney General and DEA investi-

---

3. Unbeknownst to appellant, Dr. Harmon was entering a six-week rehabilitation program in Florida for substance abuse in February of 2001. Dr. Harmon had a[sic] received a second DUI conviction. To avoid going to jail for thirty days and to avoid losing his medical license, Dr. Harmon voluntarily entered into the substance abuse program.

4. Dr. Harmon plead guilty to conspiracy to practice medicine without a license and practicing medicine without a license. Dr. Harmon testified on behalf of the State and cooperated fully with law enforcement. Dr. Harmon received seventeen years probation, and is currently engaged in a two-year mission in Ghana, Africa.

gators began obtaining information from approximately three hundred of appellant's patients. These patients, who had been identified from filled prescriptions retained by the pharmacies which had filled them, relayed similar stories to the investigators. Patients went into appellant's office, paid approximately $60 in cash for the office visit, and then received prescriptions for pain management. The patients' statements to investigators reflected that appellant had performed little if any diagnostic testing before writing their prescriptions. Upon later examination, the appellant's files tended to confirm those accounts.

The investigation, which went on from October 2000 through February 2001, led to the issuance of a search warrant authorizing the seizure of patient files and other documents on March 2, 2001. During this search, 328 patient files were seized. Of those files, ten patient files were submitted to the Commonwealth's expert witness, Dr. William Vilensky, for review. At trial, the Commonwealth called nine of these ten patients, as well as Dr. Vilensky, members of appellant's staff and investigators to describe the extent of the appellant's prescribing of controlled substances and the circumstances surrounding the issuance of those prescriptions.

Appellant was tried on: three counts charging violation of 35 Pa.C.S. § 780–13(a)(30)—delivery of the controlled substance Vicodin (a Schedule III substance) to Carl Dugger; delivery of the controlled substance Xanax (a Schedule IV substance) to Carl Dugger; delivery of controlled substances generally (covering all other deliveries of controlled substances); one count charging conspiracy with Drs. Wesley Collier and/or David Harmon to deliver controlled substances in violation of 18 Pa.C.S. § 903(a); one count charging practicing osteopathic medicine without a license in violation of 63 Pa.C.S. § 271.3; one count of conspiracy with Drs. Wesley Collier and/or David Harmon to commit the crime of practicing osteopathic medicine without a license in violation of 18 Pa.C.S. § 903(a); one count of prescribing controlled substances contrary to the requirements of the law in violation of 35 P.S. § 780–113(1)(14); one count of conspiracy with Drs. Wesley Collier and/or David Harmon to prescribe controlled substances contrary to the requirements of the law in violation of 18 Pa.C.S. § 903(a); and 550 counts of insurance fraud in violation of 18 Pa.C.S. § 4117(a)(2).

On April 12, 2002, appellant was convicted by a jury of 179 of the 550 counts of insurance fraud and all of the other charges.

Lower court opinion, 2/19/03, at 1–7.

¶ 3 Appellant raises the following issues on appeal:

A. Did the court commit reversible error in refusing to grant appellant's pre-trial motion to quash the information and/or suppress all evidence in the instant case because the Attorney General's office exceeded its jurisdiction in conducting the investigation and prosecution of the instant case?

B. Did the Commonwealth and court commit reversible error by permitting the unlawful and improper questioning of the Commonwealth's expert in violation of the standard set forth by this court in *Commonwealth v. Salameh*, [421 Pa.Super. 320] 617 A.2d 1314 (Pa.Super.1992)?

C. Was the sentence imposed by the lower court of 30–120 years manifestly unjust and excessive and in violation of the legislature's intent

at promulgating sentencing guidelines and those guidelines?

D. Did the lower court err when it failed to dismiss and permitted the prosecution of appellant on the charge of delivery of a controlled substance pursuant to 35 Pa.C.S.A. § 780–113(a)(3) in that appellant is a doctor and a more specific charge of 35 Pa.C.S.A. §§ 780–113(a)(13) or (a)(14) applies, all of which is in violation of 1 Pa.C.S.A. § 1933?

¶ 4 The appellant first complains that the investigation and prosecution of him by the Attorney General's office was improper. In so arguing, he relies upon 71 P.S. § 732–205 which defines the prosecutorial powers of the Office of the Attorney General. Reliance is based upon the opinion of the supreme court in *Commonwealth v. Carsia,* 512 Pa. 509, 517 A.2d 956 (1986). In that case, the supreme court affirmed the decision of this court in *Commonwealth v. Carsia,* 341 Pa.Super. 232, 491 A.2d 237 (1985), which decided that the Attorney General can only investigate and prosecute criminal actions within the confines of the Commonwealth Attorneys Act. The order of this court, affirmed by the supreme court, was an affirmation of the trial court order which quashed the information. It is important to note that *Carsia* involved a prosecution by the Office of the Attorney General and the quashal which was granted was in response to a petition to quash on the basis that the Attorney General's authority to prosecute a case is determined by § 205 of the Commonwealth Attorneys Act. 71 P.S. § 732–205(a)(1–8). Although the Commonwealth instantly made arguments aimed at fitting this case within the enumerated bases for Attorney General prosecutorial powers, recognizing the broad sweep of *Carsia,* no such argument is made here on appeal. Instead, it is asserted that the present prosecution was conducted by the District Attorney of Bucks County and not the Office of the Attorney General. It is contended that, indeed the very alternative that was argued for in *Carsia* has been met in this case, *i.e.,* prosecution not in the hands of the Attorney General but rather in the office of the District Attorney having jurisdiction.

¶ 5 It is argued that the Attorney General's participation in this case is fully warranted under § 732–206, law enforcement and criminal investigation, investigating grand juries. The distinction is drawn to the difference between § 732–205 which relates to prosecutions and § 732–206 which relates to investigations.

¶ 6 The statute provides, in relevant part, that, "The Attorney General shall have the power to investigate any criminal offense which he has the power to prosecute under Section 205; he shall continue the existing programs relating to drug law enforcement." 71 P.S. § 732–206(a).

■ ¶ 7 There can be no question that the instant case involves drug law enforcement. Thus, it is within the regulatory aegis of the Controlled Substance, Drug, Device and Cosmetic Act. 35 P.S. § 780–101 *et. seq.* Under § 780–134 the provisions of the Act are to be administered by the department. Under the same provision, the department, through its secretary, is authorized, *inter alia,* to employ personnel to establish a Bureau of Drug Control and to carry out enforcement functions. "Department" is defined to mean the Department of Health of the Commonwealth of Pennsylvania. However, this provision was suspended by the Reorganization Plan of 1973. The Reorganization Plan, No. 6 of 1973, in turn, transferred the operation of the Bureau of Drug Control and the powers and duties created by the Controlled Substance Drug, Device and Cosmetics Act to the Department of Justice and the Attorney General. 71 P.S. § 751–18, effective July 1, 1973. This

transfer of authority, of course, long preceded the grant of investigative powers for drug enforcement contained in 71 P.S. § 732–206, which became effective January 20, 1981. As well, it long preceded the occurrence of any facts relevant to the instant prosecution of appellant. We conclude that the Attorney General's participation in this matter is fully authorized by law and does not run afoul of *Commonwealth v. Carsia*, or of the Commonwealth Attorneys Act.[5]

¶ 8 The next issue has to do with the testimony of a Commonwealth expert, William Vilensky, D.O. R.Ph., who qualified as an expert both as a physician and as a pharmacist. The issue relates to questions asked of the expert concerning the drug prescriptions given to a number of appellant's patients. The provision of the Controlled Substance, Drug, Device and Cosmetic Act which appellant is alleged to have violated is:

> (14) The administration, dispensing, delivery, gift or prescription of any controlled substance by any practitioner or professional assistant under the practitioner's direction and supervision unless done (i) in good faith in the course of his professional practice; (ii) within the scope of the patient relationship; (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession.

35 P.S. § 780–113(14).

¶ 9 The gist of the prosecution's claim is that appellant prescribed drugs in violation of the third principle, *i.e.*, not in accordance with treatment principles accepted by a responsible segment of the medical profession. 35 P.S. § 780–113(14)(iii).

5. A similar result was reached in *Commonwealth v. Dupcavitch*, 36 D. & C.3d 238 (Lu-zerne County 1985).

¶ 10 Appellant places principal reliance on *Commonwealth v. Salameh*, 421 Pa.Super. 320, 617 A.2d 1314 (1992). In that case, our court held that the trial court in explaining the standard to the jury in its charge, erroneously stated that the burden was met if the jury found that a responsible segment of the medical profession would find that the instant prescription was unacceptable. Error was found in that it is not enough that a responsible segment would find the prescription unacceptable, but rather that no responsible segment would find the act acceptable. The charge was found to be fatally misleading and a new trial was granted as to these charges. We first observe that *Salameh* is inapposite to the instant matter. *Salameh* involved an erroneous charge to a jury. We have examined the court's charge in this case and find that it is not defective under *Salameh* and appellant makes no argument to the contrary.

¶ 11 We take appellant's argument to mean that the evidence was insufficient to meet the standard requirement. If we take the opinion offered by the witness as to patient Tammy Davalos, we find:

Q. After examining that file, did you make any determinations whether the defendant, Richard Paolino, deviated from medically recognized treatment principles that would be expected from a responsible segment of physicians in the community?

MR. GRAHAM: Objection.

THE COURT: And the nature of this objection.

MR. GRAHAM: Form of the question.

THE COURT: Overruled.

A. The answer is yes.

N.T., 4/8/02, at 202.

¶ 12 This can only be understood to mean that there is not a responsible segment of the medical profession which would consider Paolino's treatment principles as acceptable.

¶ 13 Again, as to patient, Angela DeRito, the question was asked in words that closely tracked the language of the statute:

Q. And, sir, again, given your examination of this record and everything contained therein, did you formulate an opinion within a reasonable degree of medical certainty, whether, considering the prescription here prescribing, whether the defendant deviated from the treatment principles that would be accepted by a responsible segment of physicians in the community?

A. Yes.

. . . . . . . . . .

Protracted objection and discussion

. . . . . . . . . .

THE COURT: Overruled.

You may answer.

BY MR. GAMBARADELLA:

Q. Sir?

A. I do have an opinion.

Dr. Paolino deviated from the standard of medical practice expected of the responsible segment of physicians giving this female, who has higher blood level of Oxycontin than males, large doses, allowing her to take up to between 240 to 320 milligrams of Oxycontin a day, without any prior medical records, and if any other doctor—

MR. GRAHAM: Objection.

A. And without proper medical examination.

THE COURT: Overruled.

A. In my opinion, going further, that this deviation from the standard of care is not simple or mild deviation,

but gross deviation. And that a responsible segment of physicians would not give a young lady, without examination, without x-ray, without prior medical records to say what she had before, up to 320 milligrams a day—

N.T., 4/8/02, at 205–207.

*As to Carl Dugger*

Q. And again, sir, given your examination of the file, do you have an opinion to a reasonable degree of medical certainty, concerning the prescribing that was done here, whether that was done within medically-accepted treatment principles that would be expected from a reasonable segment of physicians in the community?

A. I do.

.     .     .     .     .

Q. And what is that opinion?

A. My opinion, to a reasonable degree of medical certainty, is that the doctor did an incomplete examination. He didn't examine the knee which was the chief problem, didn't—

MR. GRAHAM: Objection.

A. —flex the knee.

THE COURT: I'm—

MR. GRAHAM: Again, just so we're real clear on this. He is testifying from the chart, is that—

THE COURT: I think the jury understands that—

MR. GRAHAM: Okay.

THE COURT:—by now.

I will permit the witness to continue with his answer.

A. There was no range of motion in testing the knee, whether it can be flexed, straightened, et cetera. And, in addition, this patient claimed that he had two surgeries

on his right knee prior to coming to Dr. Paolino. There is not one prior medical record, hospital record, surgical record, that talks about knee surgery. I'm not doubting that there was knee surgery, but now the doctor is treating him in the blind. He has no idea what was done. There is no surgeon's, orthopedic doctor's report. There is no range of motion. And he simply took the patient's word that he had previous medications of controlled dangerous substances. So on the first visit, the doctor prescribed controlled drugs and, in addition to two other drugs that have addictive effects, in addition to that. And those drugs were Lorcet, that is a Scheduled III drug, 10 milligrams of hydrocodone, and that's six times stronger than codein, to put it in perspective. It is given with 650 milligrams of Tylenol. And that combination was given also with Ambien which is a hypnotic drug to put you to sleep. Both drugs, being central nervous system depressants. The prescription for Lorcet, he gave him 112 tablets to take four times a day for a 28–day supply. That is not an unusual dosage, to take it for four times a day. But on this first visit, he is giving him a whole month's supply, rather than giving small amounts, see if it works, bring the patient back, and go up if he needs it, or goes down in strength if the patient needs it. And I think I have answered your question, he is giving double—double depressant drugs which have an addictive effect.

N.T., 4/8/02, at 211–214.

*As to Jason Fisher:*

If you are content, Mr. Gambardella, that you have covered the factual information about—

MR. GAMBARDELLA: Yes, your Honor.

THE COURT:—the medical record of Jason Fisher, I think the ladies and gentlemen of the jury will recall that the doctor has said that he had an opinion about whether proper—now I have to frame the question I suppose—whether the—the prescribing of any controlled substances for Mr. Fisher by Defendant Paolino were in accordance with treatment principles accepted by a responsible segment of the medical profession.

The doctor said, yes, he had an opinion. I am going to ask you, Doctor, what is your opinion.

And you may explain.

THE WITNESS: My opinion, within a reasonable degree of medical certainly, is that Dr. Paolino deviated—grossly deviated from the standard of practice that is seen in the practice of responsible physicians in the community. And my basis for this is that in the record the patient was given, as an example, 14 days worth of medicine but came back in three days and got more. And then, just shortly after, he came in and said all his medicines were stolen and he needed another prescription. And the doctor gave him another prescription.

N.T., 4/8/02, at 235–236.

¶ 14 Here it is to be noted that the court framed the question which, again, can only be seen as asking if *any* responsible segment of the profession would accept Paolino's treatment principles as drawn from the facts. The witness later added on his opinion which makes clear that the deviation was from a standard of treatment not acceptable to any segment of the profession:

BY MR. GAMBARDELLA:

Q. Doctor, again given your entire reading of the file, given your training and experience, were you able

to make a determination to a reasonable degree of medical certainty as to whether the physician in this case deviated from medically accepted treatment principles that would be expected from a reasonable segment of physicians in the community?

THE COURT: What is your opinion?

THE WITNESS: My opinion within a reasonable degree of medical certainty is that Dr. Paolino saw and treated this patient without proper examination in many areas of the physical examination and prescribed the most potent controlled substances while not observing this patient with track marks, with a police report that stands out as being not reliable and continued to treat this patient with increasing doses, higher doses, stronger doses, plus additional OxyContin in the form of short-acting ones for a patient that complained of back pain with a most sensitive test called an MRI which showed that there was nothing wrong with the patient's back. And he continued to prescribe and prescribe when the patient came in asking for refills.

All of this in my opinion is a deviation from the standard of medical care that the responsible physician would do in a similar—with a similar patient. And this deviation from the standard of care in my opinion is a gross deviation from the standard of medical care.

N.T., 4/9/02, at 26, 29–30.

*As to Michele Glowacki:*

Q. Doctor, again, concerning your review of the files, concerning the prescribing that you reviewed in this particular file, did you make a determination, given your expertise, given your training and experience, did you make a determination to a reasonable medical certainty whether the defendant, Richard Paolino,

deviated from the medically accepted treatment principles that would be expected from a responsible segment of physicians in our community, sir?

MR. GRAHAM: Objection.

THE COURT: If I didn't hear it—and it's a long question—in prescribing, did you say?

MR. GAMBARDELLA: Yes.

THE COURT: Making sure that's a part of the question, overruled.

You may answer, Doctor.

THE WITNESS: Thank you, sir. I have an opinion.

BY MR. GAMBARDELLA:

Q. What is that opinion, sir?

A. My opinion, based on the medical records of Dr. Paolino and medical records that he received from a hospital clinic that indicated that this patient was not only an alcohol abuser but characterized it as severe and recurrent, in other words, kept on drinking, and with no blood-alcohol test done, in fact no blood test done whatsoever in an alcoholic you have to do to see if the liver is functioning properly, because if the liver is not functioning properly, it interferes with the use of other drugs, especially OxyContin.

So without taking any laboratory tests, without taking the simple blood-alcohol level, the doctor prescribed the strongest strength of OxyContin to a female that has a higher level in the blood stream compared to a male and to a patient who is opioid naïve, was not on opioids in the past, in addition to the fact of being 18 years old which makes her more susceptible to the effects of that as a younger person, and then ignoring the report that he received about her condition.

MR. GRAHAM: Objection as to "ignoring."

THE COURT: Again, Doctor, make sure that you confine yourself to the matters that are contained in the chart or not contained in the chart and proper inferences therefrom. Resist the temptation to exercise poetic license in terms of what you deduce from that.

With that caution, you may continue your explanation of your opinion.

THE WITNESS: Despite having the previous medical record, the doctor prescribed OxyContin on the first visit in the dose of 240 milligrams per day. And it is my opinion within a reasonable medical certainty, because of the dose, because of the significant history of the recurrent severe alcohol abuse, that the combination of alcohol and OxyContin is an important and significant finding and that leads me to state that the combination can cause from both of those drugs, alcohol and Oxy-Contin, respiratory depression which would jeopardize the health, welfare and safety and even life of this patient.

And it is my opinion that that is a deviation from the standards of medical practice that would be seen by the responsible segment of physicians, and the deviation from that standard is a gross deviation and in my opinion it is reckless negligence.

N.T., 4/9/02, at 65–68.

*As to Jennifer Smith:*

Q. Doctor, again given your examination of this file, given your expertise, did you make a determination concerning the prescribing that was being done here to a reasonable medial certainty, did you make a determination as to whether the defendant, Richard Paolino, deviated from medically accepted treatment principles that would be expected from a responsible segment of physicians in the community?

MR. GRAHAM: Objection.

THE COURT: Overruled.

THE WITNESS: Yes, I have.

BY MR. GAMBARDELLA:

Q. What is that opinion, sir?

A. In my opinion within a reasonable medical certainty, Dr. Paolino prescribed a Schedule II narcotic, OxyContin, to a patient who was an opioid-naïve patient, had not taken these drugs before, to a female where we would expect a 25 percent higher drug level of the drug compared to males, in addition to another central nervous system depressant, Valium, for the diagnosis that she had damaged her low-back and without any prior medical records in the chart, without any x-rays of the back, either old or new. The doctor prescribed these medications on one occasion a week earlier when the patient came back requesting a re-fill.

And in my opinion there's nothing on this chart that justifies the prescribing of this potent but good analgesic but without justification. We don't even know what damage was done. That was the patient's report. She had damage. I don't know whether—there's nothing on the report that says what the damage was from what I could read. It said damage to the low-back. And without justification, these are strong—this Oxy-Contin is a very strong drug to start off with when a lesser potency drug could be given and then on examination of the patient could be titrated up to higher doses or higher types of drugs, such as OxyContin.

But the doctor started out with a blast of the OxyContin as the first drug he prescribed.

He did this knowingly and willingly.

MR. GRAHAM: Objection.

Objection, your Honor.

THE COURT: Sustained. That you can't possibly know, Doctor, and the jury will disregard any characterizations about the state of mind of the defendant in connection with the treatment of this individual.

BY MR. GAMBARDELLA:

Q. Let me ask you this, Doctor. If you find it to be a deviation, to what extent do you find it to be a deviation?

MR. GRAHAM: Objection.

THE COURT: Overruled.

THE WITNESS: In my opinion I feel this is a deviation from the standard of medical care practiced by the responsible segment of physicians, and by the types of medication and examination or lack of examination that this is not only a deviation but it's a gross deviation from the accepted standards of medical practice.

N.T., 4/9/02, at 77–79.

*As to Stacy Turner:*

Q. Doctor, again, given your—hold on a second.

Again, given your expertise, given your examination of this particular file, did you make a determination to a reasonable degree of medical certainty concerning the prescribing that was going on here as to whether the defendant, Richard Paolino, deviated from the medically accepted standard of care that would be expected from a reasonable segment of physicians in our community, sir?

A. I did.

MR. GRAHAM: Objection.

THE COURT: Overruled.

BY MR. GAMBARDELLA:

Q. What is that opinion?

A. That within a reasonable medical certainty Dr. Paolino prescribed OxyContin and Valium, two controlled substances, together having an additive effect, when there was not enough information as to the cause of the pain; that is, the history of the chief complaint. The examination, the notation that the patient has anorexia, which is a marked underweight condition, not eating, which is commonly linked in all the literature to substance abuse and offered her a prescription to get an x-ray; another one—no x-ray was ever taken—not taken but no x-ray was in this chart as to a report that was ever done.

And in my opinion, within a reasonable medical certainty, Dr. Paolino deviated from the standard of care that would be seen in the responsible treatment of patients by responsible physicians, and that deviation, with the medications and examination or lack of in my opinion represents gross deviation.

N.T., 4/9/02, at 88–90.

¶ 15 We conclude, and as appellant concedes, the charge of the court was correct and to that extent the only authority proffered by appellant, *Commonwealth v. Salameh, supra* is irrelevant. Further, we conclude, after an examination of the record, that the questions posed to the expert were proper to elicit an opinion as to the compliance with 35 P.S. § 780–113(14)(iii) and were not objectionable, and the court did not err in its rulings. Finally, we conclude that the opinions of the expert fully meet this standard of 35 P.S. § 780–113(14)(iii).

¶ 16 Next, appellant argues that the 30 to 120 year sentence was manifestly

unjust and excessive and in violation of the intent of the sentencing guidelines. The appellant has failed to separately state reasons for allowance of appeal. 42 Pa. C.S.A. § 9781(b). There is no argument that the sentence is illegal, therefore the stated requirement applies. *Commonwealth v. Zelinski*, 392 Pa.Super. 489, 573 A.2d 569 (1990), *appeal denied*, 527 Pa. 646, 593 A.2d 419 (1990); *Commonwealth v. Tuladziecki*, 513 Pa. 508, 522 A.2d 17 (1987). However, the Commonwealth has failed to object to this omission and, thus, the failure to comply is waived. *Commonwealth v. Krum*, 367 Pa.Super. 511, 533 A.2d 134 (1987) (*en banc*); *Commonwealth v. Zelinski, supra.* Hence, we review the sentence.

¶ 17 Appellant, on appeal, makes the same argument that was offered at sentencing. He reiterates the testimony of appellant's adult son, as well as the testimony of patients who had been treated successfully by appellant during his career. It is argued that the court ignored the positive aspects of Dr. Paolino's life.

■ ¶ 18 In sentencing, the court acknowledged hearing some "wonderful testimony" from former patients and concluded that, at times, appellant provided "selfless and able medical service" to his patients. However, the court was persuaded by other factors:

> The conduct which was proven to the jury in this case beyond a reasonable doubt and which was augmented or further described in the presentence investigation, including other information about this defendant, the fact that he served prison time for theft by deception some years ago, was successfully sued, I gather, or at least settled cases involving sexual harassment in which judgments were entered against him, and for the purposes of my consideration today most strikingly continues to claim, as the Commonwealth has just pointed out,

that his conduct in this case involved the appropriate practice of medicine in the face of overwhelming evidence that it was not, represents another side to that coin.

> Specifically, my reasons for departing from the sentences recommended to me by the guidelines are several. First, it is plain that the conduct of the defendant as found by the jury facilitated extensive abuse of narcotics, narcotic substances, by a host of people in the Delaware Valley community, perhaps beyond.

> The burden of narcotic abuse upon our society is stunning. In this court we see only the tip of the iceberg, but that is enough. Parents' neglect of their children, sometimes with devastating and fatal results, the dissolution of families, the violence within the family and throughout the community, thievery on a vast scale, traffic accidents, the attendant injury and death, the vast loss of productivity as people with the potential to lead happy and useful lives instead become threats to the law abiding and leeches upon the hard working.

> The fact that many of them, young people from the testimony in this case, who might well not have had the—I'm not sure what the right word would be—to go to a drug dealer, to actually seek out crack cocaine or heroin, would be introduced to drugs, several of them—particularly we have heard a lot about Oxy–Contin in this case—but a number of drugs which have dependence-inducing potential is particularly distressing. By doing these things in the guise of medical practice, I perceive that this defendant breached a sacred trust.

N.T., 6/20/02, at 62–64.

¶ 19 The court was particularly distressed that appellant, in seeking to enhance his income as the result of losses

incurred in other misadventures, decided to go into the "pain management business" and, thus, his problems arose since he was experiencing a learning curve in that new enterprise.

¶ 20 The court bespeaks the betrayal of patients:

Perhaps the saddest, most outrageous testimony in my view was not that a couple of witnesses who just plainly were going in and getting prescriptions with a wink and a nod at selling those items off for a profit-that part of it was drug dealing and it's offensive and troublesome in its own way—but a number of the patients who testified were patients, went to the doctor because they perceived that they had an ailment that he could help them with. And perhaps the most outrageous testimony in my view was that of—at least that I recall—one of the young ladies who had a back problem and sort of wistfully acknowledged that she never had been as pain free as she was when she was getting Oxy–Contin from Dr. Paolino.

The fact that the undisputed testimony from the Commonwealth in this case was that that was vast overkill, that that was an absolutely inappropriate treatment, which would tend to mask real symptoms and create a dependency sort of akin to killing a mouse with an atom bomb, is just to me the worst betrayal of patients. No doubt, that patient—and we have heard from a number of other patients that they perceived the effects upon themselves and stopped taking the prescription medicine, the medicine that they had been prescribed, because they were in constant fog and they weren't able to function.

I have no doubt that the defendant made some people pain free, maybe free of just about every sensation, but that was not good or proper medical practice, but evidently it did make for satisfied customers who were willing to come back and pay to get more prescriptions.

N.T., 6/20/02, at 68–70.

¶ 21 Finally, the court stated reasons for the length of sentence:

I perceive that if this defendant is not incarcerated, there is no good reason to believe that he will not find some way to harm others if it is in his interest to do so.

Further, any less sentence that I impose in this case would deprecate the terrible seriousness of the damage which this defendant has done by his conduct, whether intended or not.

Finally, the sentence I am going to impose is intended to be a deterrent. Let me observe that I don't believe as a general matter that sentences either imposed by a judge in a particular case or mandatory sentences enacted as laws serve as deterrents. Most criminals are impulsive, with little ability to foresee the consequences of their actions, and most harbor a generally stupid belief that they won't get caught.

In this case however, the defendant was a practicing physician. He committed his crimes as a physician. His professional position enabled him to deliver drugs or see to it that they were delivered with an expectation of impunity. He has the gall to this day to claim that his conduct was within the scope of legitimate professional judgment, and it took an investigation of vast extent to prove to the satisfaction of a jury that his conduct was not within the scope of legitimate medical judgment but constituted criminal conduct.

N.T., 6/20/02, at 71–72.

¶ 22 We have held that "did not consider" or "failed to consider" arguments do not merit grant of review. *Commonwealth v. Montalvo*, 434 Pa.Super. 14,

641 A.2d 1176 (1994). *A fortiori,* they lack substantive merit. A sentence outside the guidelines may be affirmed if the departure is reasonable. *Commonwealth v. Johnakin,* 348 Pa.Super. 432, 502 A.2d 620 (1985); *Commonwealth v. Darden,* 366 Pa.Super. 597, 531 A.2d 1144 (1987). The standard we apply is whether the court's sentence outside the guidelines is unreasonable. 42 Pa.C.S.A. § 9781(c); *Commonwealth v. Rooney,* 296 Pa.Super. 288, 442 A.2d 773 (1982); *Commonwealth v. Cappellini,* 456 Pa.Super. 498, 690 A.2d 1220 (1997).

¶ 23 After a careful review of the record and the unique circumstances as presented in this case, we conclude that the sentence imposed is not impermissibly excessive.

¶ 24 Finally, it is argued that appellant was improperly charged with distribution under the general provision of § 780–113(30) rather than the more specific § 780–113(13) & (14) which relate to practitioners or professionals. Appellant relies on *Commonwealth v. Brown,* 346 Pa. 192, 29 A.2d 793 (1943). The Commonwealth cogently argues that *Brown* involved two statutes whereas presently we have distinct provisions under a single statute. As Paolino was unlicensed, he could be charged with delivering under the general provision (30) which specifically references unregistered or unlicensed distributors. He was also exposed to prosecution under (13) and (14) under the theory that he acted as an accomplice to his co-defendant, a licensed practitioner. There is no merit to appellant's final argument which also appears to be waived as not contained in the issues sought to be raised on appeal. *Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306 (1998).

¶ 25 Judgment of sentence affirmed.