J-S73022-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KELVIN MADERA | : | |
| | : | |
| Appellant | : | No. 535 MDA 2019 |

Appeal from the Judgment of Sentence Entered October 25, 2018
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0000017-2017

BEFORE: SHOGAN, J., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:　　　　　**FILED: OCTOBER 7, 2020**

Kelvin Madera appeals from the judgment of sentence, entered in the Court of Common Pleas of Berks County, following his conviction for two counts each of possession with intent to deliver (PWID - heroin and cocaine)[1] and possession of a controlled substance (heroin and cocaine)[2] and one count each of conspiracy to commit delivery of a controlled substance[3] and conspiracy to commit possession of a controlled substance.[4] After careful review, we affirm.

---

[1] 35 P.S. § 780-113(a)(30).

[2] 35 P.S. § 780-113(a)(16).

[3] 18 Pa.C.S. § 903(a)(1); 35 P.S. § 780-115(a)(30).

[4] 18 Pa.C.S. § 903(a)(1); 35 P.S. § 780-115(a)(16).

Madera was raised by his parents, Madeline Rivera (Rivera) and Jesus Madera (a/k/a Chelo) (collectively, Parents), in a home located at 504 East Wyomissing Avenue, Reading, Pennsylvania. On August 19, 2016, detectives from the Berks County District Attorney's Office began surveilling the family home under the suspicion that Parents were using the residence to package and distribute cocaine and heroin. Trial Court Opinion, 5/27/20, at ¶ 3. On September 1, 2016, twelve days after detectives successfully completed an undercover purchase of cocaine from Chelo, the D.A.'s office organized another undercover purchase, this time with Rivera, and subsequently arrested her on her way to complete the deal. *Id.* Detectives discovered four white glassine baggies of heroin (two with a "distinct green logo" on the exterior) and one baggie of cocaine in Rivera's possession. *Id.*

After securing a search warrant, detectives entered the family home, where Chelo was seated on the couch and in possession of the cell phone used to conduct the undercover buy.[5] At that time, Chelo stated that "[he was] going to take the charges [and that] everything in the house [was his]." N.T. Jury Trial, 9/18/18, at 121. Chelo then directed the detectives to a black jacket at the top of the stairs where he claimed they could find a "few

---

[5] According to the trial testimony of Detective Joseph Walsh, Chelo was given his *Miranda* rights by Sergeant Todd Harris prior to this questioning. N.T. Jury Trial, 9/18/18, at 90.

bundles[6] of heroin and some [baggies] of coke." *Id.* at 120. After locating the jacket, detectives continued their search of the second floor of the residence where they found Madera lying on the bed in the second-floor front bedroom. *Id.* at 122. Madera's cell phone was taken into evidence; because he was not considered a suspect at that time, he was not arrested. *Id.* at 122, 173.

However, detectives later searched Madera's bedroom where they found clothing that appeared to fit Madera, mail addressed to Madera, Madera's social security card and birth certificate, and "11 baggies of cocaine[,] a large metal cocaine press, several bottles of a cutting agent, a digital scale, rolling papers, and rubber bands [used for bundling bags of drugs]." Trial Court Opinion, 5/27/20, at ¶ 4. Additionally, detectives found a gray Old Navy pea coat, size men's large, in the second-floor bedroom closet. The top, right pocket of the pea coat contained new and unused plastic Ziploc baggies, as well as 288 white glassine packets containing heroin.[7] N.T. Jury Trial, 9/18/18, at 177. Detectives subsequently searched Madera's cell phone, pursuant to a warrant, and found four separate text message conversations between Madera and an individual named "Jerry," from whom detectives believed Madera had purchased heroin. N.T. Jury Trial, 9/18/18, at 173, 193.

---

[6] According to Sergeant Harris, "a bundle of heroin . . . is 10 glassine packets of heroin [which are] rubber banded together." *Id.* at 121.

[7] Thus, this amount was two baggies short of 29 full bundles. *See* N.T. Jury Trial, 9/18/18, at 178.

In the first text conversation, which occurred on August 15, 2016—just fifteen days before the search of the family home—Jerry asked if Madera "still wanted the shoes size 10" and stated that "it w[ould] be [$]750." Commonwealth's Exhibit 1, at 105, 108. Madera and Jerry met later that day in a local Burger King parking lot to complete the transaction. N.T. Jury Trial, 9/18/18, at 195. On August 29, 2016, just two days before the search, Madera texted Jerry that "[the product had] gotten weak [and it has] slowed me down big time." Commonwealth's Exhibit 1, at 119. Jerry claimed to have gotten "some[]thing new," to which Madera responded that he had "no cash" because he still "[had] a lot of food from going shopping the last time." *Id.* Madera then asked whether "there [was] any way [to] switch what [Jerry] gave [him] last [time] . . . [because it's] just sitting." *Id.* at 122. On September 1, 2016, approximately 2½ hours before detectives searched Madera's house, Madera told Jerry that "people[] is [sic] going else[]where instead to me," and that "this [product] ain[']t [sic] with it man [a]n[d] I gotta [sic] get bills paid." *Id.*

After reviewing these text messages and identifying Madera's fingerprints on the cocaine press found in his room, Madera was placed under arrest.[8] N.T. Jury Trial, 9/18/18, at 201; *see also* Trial Court 1925(a) Opinion, 5/27/20, at 4. Prior to trial, the Commonwealth filed a Pa.R.E. 404(b)

---

[8] In all, detectives located "approximately 6.7 grams" of heroin and "approximately 10.59 grams" of cocaine in Madera's house. N.T. Jury Trial, 9/19/18, at 298, 310.

- 4 -

notice of its intent to introduce the text conversations between Madera and Jerry. In its notice, the Commonwealth averred it "believes [the texts] illustrate evidence of drug trafficking at around the date and time of the above[-]captioned matter." Commonwealth's Pa.R.E. 404(b) Notice, 1/12/18, at 1. On January 29, 2018, Madera filed a motion *in limine* to exclude the Rule 404(b) testimony claiming that the "alleged communications have absolutely no connection to the incidents charged" and that they "are not relevant to the current matter" and, thus should be precluded. Motion *In Limine*, 1/29/18, at 1-2. The court held a hearing on Madera's motion on March 9, 2018. On September 2, 2018, the court denied Madera's motion *in limine*.

At trial, Madera testified that he had not lived at Parents' house since he was 18 years old, that because he moved around a lot he had his mail sent to Parent's house, and that he was only visiting their house at the time of the search. N.T. Jury Trial, 9/19/18, at 425, 427-29. Further, Madera claimed that he first saw the cocaine press in his room earlier in the summer of 2016. *Id.* at 429-31. Unaware of its purpose, Madera stated that he did in fact touch the device "two or three" times that summer, but only did so to move it out of his way and into his closet. *Id.* Madera testified that he was not involved in selling drugs with Parents.

Madera also testified at length about his text messages with Jerry. *Id.* at 435-42. Madera testified that these messages were related to a personal purchase of "10 bags of weed" and not for the heroin found in his closet. *Id.*

at 435. Madera claimed that Jerry "mistype[d 750]" when quoting the price of the drugs and that Madera "easily assumed that the zero was just an extra or an accident." *Id.* at 436. Madera acknowledged that the amount of drugs he received was "short," but stated that he "never used a scale" and knew the weight of the drug based on intuition. *Id.* at 437. When asked what he meant by "peoples is [sic] going elsewhere instead to me," Madera testified that he "was just having a bad day," and that "[he] was just frustrated overall." *Id.* at 440. Lastly, Madera claimed that his reference to "bills" was just him "complaining, hoping [he] would get . . . a refund in cash" and that it was not a reference to an inability to sell drugs to pay his bills. *Id.*

Detective John Lackner also testified at length about the heroin trade and the drugs found in Madera's closet, as well as his interpretation of Madera's text messages with Jerry. *Id.* at 297-348. Detective Lackner testified that, in his professional experience, Madera's conversation with Jerry was typical of a conversation between "people that are involved in drug trafficking." *Id.* at 331. Lackner further stated that a "size 10 shoe" was code for "10 of something" and that at the time of the text conversations, 10 grams of heroin cost roughly $750, the price quoted by Jerry. *Id.* at 331-33. With respect to the heroin found in Madera's bedroom, Lackner testified that the heroin was clearly not for personal use, stating "[i]f I w[ere] a user . . . I wouldn't purchase this amount, 6.7 grams of heroin, as it's packaged here today because I'd spend a lot more money on that [amount] than if I would buy it in bulk." *Id.* at 300.

Following a four-day jury trial in September 2018, Madera was found guilty by a jury of the above-mentioned offenses.[9]  At sentencing Madera stated, "I'd just like to say that everybody makes mistakes . . . [a]nd here I am in my first act, first situation.  . . .  I take full responsibility for it."  N.T Sentencing, 10/25/18, at 14.  The court sentenced Madera to two consecutive terms of 14 months to 5 years' imprisonment for each PWID charge and a concurrent 10-year probationary term for the conspiracy to commit delivery charge.[10]  Madera was also deemed eligible for the Commonwealth's Recidivism Risk Reduction Incentive (RRRI)[11] Program and determined to be boot camp eligible.[12]  On November 15, 2018, Madera filed post-sentence motions challenging the weight and sufficiency of the evidence, as well as the discretionary aspects of his sentence.  On April 3, 2019, Madera's post-sentence motions were denied by operation of law.  **See** Pa.R.Crim.P. 720(B)(3)(b).

---

[9] The original criminal information charged Madera with two counts of delivery of a controlled substance (heroin and cocaine) and conspiracy to commit delivery.  However, on September 17, 2018, the day before trial commenced, the Commonwealth amended the information, with the agreement of defense counsel, to change the delivery charges and conspiracy (delivery) charge to PWID and conspiracy to commit PWID.  **See** Order, 9/18/18.

[10] The possession charges merged for purposes of sentencing.

[11] **See** 61 Pa.C.S. §§ 4501-4512.

[12] **See** 61 Pa.C.S. §§ 3901-3909.

Madera filed a timely notice of appeal. On April 4, 2019, the trial court ordered Madera to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal within 30 days from the date of the entry of the order on the docket. Counsel filed Madera's Rule 1925(b) statement on June 10, 2019, more than one month past the filing deadline outlined in the court's Rule 1925(b) order.[13]

On appeal, Madera presents the following issues for our consideration:

(1) The court committed an abuse of discretion in permitting the admission of evidence of prior text messages as prior bad acts evidence when the messages were unrelated to the crime for which he was charged, and, therefore, irrelevant and the prejudicial effect outweighed the probative value. ***Commonwealth v. Hicks***, 156 A.3d 1114 (Pa. 2017).

(2) The evidence at trial was not sufficient as a matter of law to support a conviction for [p]ossession with intent to deliver controlled substances.

    (a) No evidence was presented that [Madera] participated in [P]arent's drug scheme because [the] Commonwealth could not establish that there was any firm agreement or understanding that the co-defendants were working in concert or on behalf of [Madera] and there was no evidence to establish the agreement necessary to show conspiracy.

    (b) [Madera] was never seen in possession of controlled substances . . . and [he] denied the transaction.

---

[13] On January 22, 2020, our Court remanded the matter to the trial court for the preparation of a responsive Rule 1925(a) opinion. ***See Commonwealth v. Madera***, No. 535 MDA 2019 (memorandum decision filed Jan. 22, 2020) (finding that because counsel prejudiced client and was *per se* ineffective by filing Rule 1925(b) statement late, claims were not waived on appeal). On May 27, 2020, the trial court complied with our directive and filed its opinion in the matter.

(3)    The verdicts were against the weight of the evidence, and the verdicts in this case shock the conscience [sic].

Appellant's Brief, at 7.

Madera first asserts that it was prejudicial error to deny his motion *in limine* and admit his text message conversations with Jerry because the texts relate to a personal purchase of marijuana and do not bear on the crime for which he was charged. **Id.** at 18-21. Madera also argues that the texts were significantly more prejudicial than probative, as they permitted the jury to conclude that he possessed the heroin in his room and was involved in a conspiracy to sell cocaine and heroin with Parents. **Id.** Madera's argument rests generally on the claim that "without the admission of the texts, the jury could have come very easily to the [] conclusion that [when] law enforcement came [on] the day of the search[,] Madera had simply dropped into his parents' house in the course of his other activities to take a nap and *just happened to be in the wrong place at the wrong time*." **Id.** at 20 (emphasis added).

When ruling on a trial court's decision to grant or deny a motion *in limine*, our Court employs an evidentiary abuse of discretion standard of review. **Commonwealth v. Moser**, 999 A.2d 602, 605 (Pa. Super. 2010). A trial court abuses its discretion when its decision "represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a

result of partiality, prejudice, bias or ill will." *Commonwealth v. Albrecht*, 720 A.2d 693, 704 (Pa. 1998) (citation omitted).

Generally speaking, evidence is considered relevant if it "logically tend[s] to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Hicks*, 156 A.2d 1114, 1125 (Pa. 2017) (internal citation omitted); *see also* Pa.R.E. 401. Evidence of a defendant's prior bad acts, while generally not admissible to prove bad character or criminal propensity, may be admissible for some other relevant purpose. *See* Pa.R.E. 404(b); *see also Commonwealth v. Spotz*, 756 A.2d 1139, 1152 (Pa. 2000). One of the recognized exceptions to Rule 404, for which evidence of other crimes may be introduced, includes the *res gestae* exception. Pa.R.E. 404(b)(2);[14] *see also Commonwealth v. Williams*, 896 A.2d 523, 539 (Pa. 2006). Our courts have long recognized the special significance of evidence which provides jurors with the *res gestae*, or complete

---

[14] Pennsylvania Rule of Evidence 404(b)(2) provides:

**(b)** Crimes, Wrongs, or Other Acts.

**(2) Permitted Uses.** [E]vidence [of a crime, wrong, or other act] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case[,] this evidence is admissible *only if the probative value of the evidence outweighs its potential for unfair prejudice.*

Pa.R.E. 404(b)(2) (emphasis added).

history, of a crime. **Commonwealth v. Paddy**, 800 A.2d 294, 308 (Pa. 2002). In these circumstances, character evidence is admissible "where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development." **Commonwealth v. Billa**, 555 A.2d 835, 840 (Pa. 1989) **citing Commonwealth v. Lark**, 543 A.2d 491, 497 (Pa. 1988 (under *res gestae* exception, "evidence of other criminal acts is admissible 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'") (internal quotations omitted).

Instantly, the trial court admitted portions of the text messages on the grounds that it fit within the *res gestae* exception. **See Commonwealth v. Paddy**, 800 A.2d 294 (Pa. 2002). Specifically, the court introduced certain portions of text messages, but precluded references to marijuana. The court's evidentiary order stated in a footnote, "The Commonwealth may introduce the challenged relevant evidence to furnish the context or complete story of the events surrounding the alleged crimes and to demonstrate intent." Trial Court Order, 9/17/18, at n.1.

"*Res gestae*" evidence is admissible "where [it] was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts." **Commonwealth v. Lark**, 543

- 11 -

A.2d 491, 497 (Pa. 1988).[15] *See Commonwealth v. Brown*, 52 A.3d 320, 332 (Pa. Super. 2012) (must be close "interconnectedness" between bad act and charged crime where one could say "the bad acts are part of the same transaction involving the charged crime"). In assessing the applicability of the *res gestae* exception, the trial court is required to balance the probative value of the evidence in question against its prejudicial impact. *Commonwealth v. Powell*, 956 A.2d 406, 419 (Pa. 2008). Courts shall weigh factors such as "the strength of the 'other crimes' evidence . . . the time lapse between crimes, the need for the other crimes evidence, the efficacy of alternative proof of the charged crime, and the degree to which the evidence probably will rouse the jury to overmastering hostility." *Commonwealth v. Weakley*, 972 A.2d 1182, 1191 (Pa. Super. 2009) (internal citation omitted). In determining whether the probative value of the evidence is substantially outweighed by its prejudicial effect, this Court has noted that "[there is] no fixed standard on which to rely, but [that the trial court] must instead consider the nature of the crime, the evidence being offered, and all attendant circumstances." *Commonwealth v. Smith*, 808 A.2d 215, 225 (Pa. Super.

---

[15] We have previously stated that all evidence in a criminal proceeding is prejudicial to the defendant, but that relevant evidence is to be excluded only when it is *unfairly* prejudicial, or put another way, "so prejudicial that it may inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Commonwealth v. Serge*, 837 A.2d 1225, 1261 (Pa. Super. 1999) (internal citation omitted).

2002), *quoting Commonwealth v. Clark*, 421 A.2d 374, 376 (Pa. Super. 1980).

In challenging the trial court's decision to admit the text messages under the *res gestae* exception, Madera cites generally to **Commonwealth v. Brown**, 52 A.3d 320 (Pa. Super. 2012). Appellant's Brief, at 20. In **Brown**, we ruled that evidence regarding the defendant's physician's improper receipt of his medical degree twenty years earlier, as well as his submission of forged or altered documents to obtain his medical license, was erroneously admitted for proving his involvement in a prescriptions-for-cash scheme. *Id.* at 322. Finding that the alleged bad acts were "so far removed from the charged crimes," we held that they could not logically be considered a part of the "history, chain, or sequence of events." *Id.*

We find the evidence at issue in the present case is distinguishable from that in **Brown**. Compared to the 20-year lapse between the prior bad act and the prescription-for-cash scheme in **Brown**, here the text exchanges between Madera and Jerry occurred just fifteen days prior to the search and continued throughout the day of the search. N.T. Jury Trial, 9/18/18, at 193. Further, the bad acts alleged by the prosecution directly relate to the crimes for which Madera was charged and convicted. N.T. Jury Trial, 9/19/18, at 330-31. Although Madera claimed that the texts were merely used to establish that he had previously purchased marijuana or was a drug user, the text evidence was not admitted for that purpose. Specifically, the prosecution alleged that

the purchase of drugs was in effect not a "prior bad act," but rather the beginning of the history of the crime at issue. We agree.

Here, the text messages prove Madera's intent to participate in the drug activity within his home, explain the sources and quantity of the seized drugs, and establish the sequence of events which formed the history of the case. The four text message conversations tended to prove that Madera purchased 10 grams of heroin from Jerry which he repackaged and sold from his home less than three weeks before the search and arrest. The texts also illustrated Madera's displeasure about the poor quality of the product which resulted in Madera's customers having to buy their drugs elsewhere. *See* Commonwealth's Exhibit 1, at 119, 122 (Madera stating that "[the product purchased had] gotten weak" and that people were "going elsewhere instead [of coming] to [him]."); *see also id.* at 122 (Madera expressing his frustration of being unable to sell the drugs and claiming that "I gotta [sic] get bills paid."). Additionally, Detective Lackner testified at trial that Madera and Jerry's agreed-upon sale price, found in the body of the text messages, was consistent with the price of a bulk purchase of 10 grams of heroin— notably, detectives located approximately 6.7 grams of heroin in Madera's closet. N.T. Jury Trial, 9/19/18, at 298.

It is clear from the text exchanges, as well as Detective Lackner's testimony, that the evidence falls squarely within the *res gestae* exception. The texts demonstrate the history of how Madera acquired heroin with the

intent to re-sell it. They are inextricably linked to the crimes charged and they were sent close in time to the crimes themselves. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the evidence where its judgment was manifestly reasonable and without partiality, prejudice, bias or ill will. *Albrecht*, *supra*.

Madera next challenges the sufficiency of the evidence to support his convictions for PWID and conspiracy to commit delivery of a controlled substance. Specifically, he contends that: the evidence at trial did not sufficiently show that he had the intent to deliver drugs; he was never seen in possession of the controlled substances found in his house; and the Commonwealth did not establish that there was a "firm agreement" between Madera and his parents to engage in a criminal conspiracy to commit PWID. Appellant's Brief, at 6-7.

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. *Commonwealth v. Karkaria*, 625 A.2d 1167 (Pa. 1993). When reviewing a sufficiency claim, the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. *Commonwealth v. Chambers*, 599 A.2d 630 (Pa. 1991).

To establish the offense of PWID,[16] the Commonwealth must prove beyond a reasonable doubt that the defendant possessed a controlled substance with the intent to deliver it. **See Commonwealth v. Greenlee**, 212 A.3d 1038, 1045 (Pa. Super. 2019). The requisite intent to deliver can and often is determined from an examination of all the facts and surrounding circumstances. **Commonwealth v. Robinson**, 582 A.2d 14, 17 (Pa. Super. 1990). "[P]ossession with intent to deliver can be inferred from the quantity of drugs possessed and other surrounding circumstances, such as [the presence of drug paraphernalia and] lack of paraphernalia for consumption. **Commonwealth v. Jones**, 874 A.2d 108, 121 (Pa. Super. 2005).

In drug possession cases, the Commonwealth must also prove that a "defendant had knowing or intentional possession of a controlled substance, and if the substance is not found on the defendant's person, then the Commonwealth must satisfy that burden by proof of 'constructive possession.'" **Commonwealth v. Valette**, 614 A.2d 548, 549-50 (Pa. 1992). Constructive possession has been defined as "the power to control the contraband and the intent to exercise that control." **See Commonwealth v. Murdick**, 507 A.2d 1212, 1214 (Pa. 1986) (internal quotation omitted). "Intent to maintain a conscious dominion [over the contraband] . . . may be inferred from the totality of the circumstances, and from circumstantial

---

[16] 35 P.S. § 780-113(a)(30).

evidence." ***Commonwealth v. Mercado***, 617 A.2d 342, 344 (Pa. Super. 1992).

Multiple persons may constructively possess contraband if it is found in an area of joint control and equal access. ***Id.*** In ***Murdick***, the defendant was convicted of PWID for drugs found in the bedroom he shared with his wife. 507 A.2d at 1212. After this Court reversed Murdick's convictions based on insufficiency of the evidence to establish constructive possession, our Supreme Court found that this type of possession could be established if multiple actors exercise dominion over the area. ***Id.*** at 1214. The Court reinstated the defendant's convictions for possession and PWID, concluding that "even absent a marital relationship[,] constructive possession may be found in either or both actors if contraband is found in an area of joint control and equal access." ***Id.*** ***see also Commonwealth v. Macolino***, 469 A.2d 132, 134-35 (Pa. 1983).

In challenging the sufficiency of the evidence, Madera almost exclusively relies on ***Mercado***, ***supra***, where our Court reversed the defendant's PWID conviction and held that the defendant's mere presence in the building during a search, as well as his presence in the apartment where the drugs were located two days before the search, was insufficient to establish possession of the drug. ***Id.*** at 345-46. The facts in ***Mercado***, however, are notably distinguishable from those in the present case.

Here, Madera clearly exercised dominion and control over the area where the drugs were found— his bedroom. *See* N.T. Jury Trial, 9/18/18, at 158-73. Madera was not charged with PWID merely because he was present in the room where the drugs were found, but rather because his personal effects were located in that room and he claimed the room to be his. *Id.* at 158-88. Further, the drugs were packaged with materials that were also located in the room and his fingerprints were found on the press located in the bedroom closet. *Id.* In addition, unlike the defendant in *Mercado,* who was not present in the same room as the drugs during the search, Madera was in the bedroom when the police searched the house. *Id.*

With regard to his conspiracy conviction, the offense is defined, in part, as:

> **(a) Definition of conspiracy.** —A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting of facilitating its commission he:
>
> **(1)** agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime[.]

18 Pa.C.S.A. § 903(a). A conspiratorial agreement can be proven by either direct evidence or circumstantial evidence; given the secretive nature of the act, circumstantial evidence is much more likely. *See Commonwealth v. Davenport*, 452 A.2d 1058, 1061 (Pa. Super. 1982). This circumstantial evidence can consist of an association between alleged conspirators, knowledge of the commission of the crime, presence at the scene of the crime,

and, in some situations, participation in the object of the conspiracy. *See Commonwealth v. Gibson*, 668 A.2d 552, 555 (Pa. Super. 1995). Although a criminal conspiracy requires an agreement to commit an unlawful act, the existence of an agreement need not be express, but rather may be inferred from the surrounding circumstances. *Commonwealth v. Davenport*, 452 A.2d 1058, 1060 (Pa. Super. 1982). Therefore, contrary to Madera's assertion on appeal, the agreement need not be "firm" among co-conspirators to prove a criminal conspiracy.

Here, both cocaine and heroin were found in multiple places in Parents' home— in both Madera's and Rivera's bedrooms. Moreover, Parents were each caught in undercover operations selling cocaine and heroin; Rivera had just left the family home before she met with detectives to deliver drugs. N.T Jury Trial, 9/18/18, at 65-71, 88-91, 121-22, 147-52, 162-88. Further, when investigators searched Parent's home on September 1, 2016, Chelo admitted that the drugs in the house were his and that he frequently stayed at the residence. *Id.* at 90-91, 121. Not only did the logo on the two bags of heroin found on Rivera match those found in Madera's closet, but Madera was two bags short of 29 full bundles when police searched his bedroom. *Id.* at 65-71. Additionally, the jury could infer that the text conversations with Jerry indicated Madera was purchasing 10 grams of heroin for packaging and distribution.

Making all positive inferences in favor of the verdict winner at trial, there was sufficient evidence to find that Madera both possessed the drugs with the

intent to deliver and was involved in a conspiracy with Parents to sell heroin and cocaine. ***Chambers***, ***supra***.

In his final claim on appeal, Madera challenges the weight of the evidence[17] to support his convictions. Madera's entire argument consists of the following sentence: "[W]ithout the decision of the trial court regarding prior bad acts, the evidence would have been so tenuous that [the] verdict would shock the conscious of the court." Appellant's Brief, at 28. With no case law or references to the record to support his claim, we deem the issue waived. ***See*** Pa.R.A.P. 2119. However, even if we did not find the weight claim waived, we would still find it meritless having already concluded that the trial court correctly admitted the text messages under the *res gestae* exception.

Judgment of sentence affirmed.

---

[17] A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. ***Commonwealth v. Whiteman***, 485 A.2d 459, 462 (Pa. Super. 1984). An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. ***Commonwealth v. Brown***, 648 A.2d 1177, 1189 (Pa. 1994). A new trial should not be granted because of a mere conflict in the testimony or because the court on the same facts would have arrived at a different conclusion. ***Thompson v. Philadelphia***, 493 A.2d 669, 672 (Pa. 1985). In cases where these issues are raised, a new trial should be granted only when the verdict is so contrary to the evidence as to shock one's sense of justice. ***Commonwealth v. Dancy***, 650 A.2d 448, 452 (Pa. Super. 1994) (internal citation omitted).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/07/2020</u>